VAN BRUNT, P. J., O'BRIEN, HATCH and LAUGHLIN, JJ.,
concurred.

Judgment affirmed.

# Court of Appeals.

August 5, 1904.

# THE PEOPLE EX REL. ISMAR S. ELLISON v.

# PATRICK LAVIN, POLICE OFFICER, ETC.

(179 N. Y. 164.)

LOTTERY—ADVERTISING A MISDEMEANOR—PENAL CODE § 327.

A scheme providing for the distribution of a sum of money and a.
quantity of cigars among those purchasers of certain brands who
should estimate most closely the number of cigars of all brands.
upon which the government would collect taxes during a month
named, conceding that the distribution does not depend exclusively
on chance but to some extent is affected by the exercise of judg-
ment, is a lottery within the meaning of section 323 of the Penal.
Code and under section 327, advertising it is a misdemeanor.

Reversing 93 App. Div. 292.

APPEAL from an order of the Appellate Division of the Supreme Court in the first judicial department, entered April 20, 1905, which affirmed an order of Special Term sustaining a writ of habeas corpus and discharging the relator from custody.

The facts, so far as material, are stated in the opinion.

William Travers Jerome, District Attorney (Howard S. S. Gans and Samuel H. Guggenheimer of counsel) for appellant. The scheme advertised constitutes a lottery. (Hull v. Ruggles, 56 N. Y. 424; State v. Mumford, 73 Mo. 647; Negley v. Devlin, 12 Abb. Pr. [N. S.] 210; Ex parte Blanchard, 9 Nev. 101; Thomas v. People, 59 Ill. 160; Com. v. Sheriff, 10 Phila. 203; State v. Lumsden, 89 N. C. 572; Lynch v. Rosenthal, 31 L. R. A. 835; Huddleson v. State, 94 Ind, 426; State v. Boneil, 10 L. R. A. 60.)

John W. Ingram for respondent. The scheme advertised does not constitute a lottery. (People v. Elliott, 3 L. R. A. 405; People ex rel. v. Fallon, 152 N. Y. 12; Reilly v. Gray, 77 Hun, 406; People v. Reilly, 50 Mich, 384; Irving v. Britton, 28 N. Y. 529; Matter of Dwyer, 35 N. Y. S. R. 884; Caminada v. Hulton, 60 L. J. [M. C.] N. S. 116; Stoddard v. Sagar, L. R. [2 Q. B. 1895] 474; Huddleston v. State, 94 Ind. 426; Barclay v. Pearson, L. R. [2 Ch. Div. 1893] 154.

CULLEN, J.

The relator, the publisher of a trades newspaper known as the "United States Tobacco Journal," was arrested on a warrant issued by one of the justices of the Special Sessions of the city of New York, which charged him with a violation

of section 327 of the Penal Code in having advertised a lottery within this state. The complaint and depositions on which the warrant was issued showed that the relator published the following advertisement.

"The United States Tobacco Journal.

SAVE CIGAR BANDS.

Another free Distribution of

. $142,500.00

Will be made in December, 1903.

Based on the Month of November, 1903

TO SMOKERS OF

(Here follow the names of thirty brands of cigars,)

"How many cigars (of all brands, no matter by whom manufactured) will the United States collect taxes on during the month of November, 1903?

(Cigars bearing $3.00 tax per thousand).

"The persons who estimate nearest to the number of cigars on which $3.00 tax per thousand is paid during the month of November, 1903, as shown by the total sales of stamps made by the United States Internal Revenue Department during November, 1903, will be awarded as follows :

To the (1) person estimating the closest..... $5,000 in cash.

To the (2) persons whose estimates are next closest ($2,500 each)................ 5,000 "

To the (5) persons whose estimates are next closest ($1,000 each)................ 5,000 "

To the (10) persons whose estimates are next closest ( $500.00 each).......... 5,000 "

To the (20) persons whose estimates are next closest ($250.00 each)............ 5,000 "

To the (25) persons whose estimates are next closest ($100.00 each)............ 2,500 "

To the (50) persons whose estimates are next closest ($50.00 each)............. 2,500 "

To the (100) persons whose estimates are
   next closest ($25.00 each)........... $2,500 in cash.
To the (2,000) persons whose estimates are
   next closest ($10.00 each)........... 20,000  "
To the (3,000) persons whose estimates are
   next closest ($5.00 each)........,..... 15,000  "
To the 30,000 persons whose estimates are
   next closest we will send to each one
   box of 50 "Cremo" Cigars (value $2.50
   per box)........................... 75,000
      35,213

35,213 persons...................... $142,500

"Every 100 Bands from Above-named Cigars will Entitle
you to Four estimates.

" (One band from "Florodora" Cigars or one band from
"Florodora Operas" counting as two bands from the other
cigars mentioned; and no less than 100 bands will be receiv-
ed at any one time for estimates.)

"Information which may be of value in making estimates:
The number of cigars now bearing $3.00 Tax per thousand,
for which stamps were purchased, appears below :

|  | 1900. | 1901. | 1902. |
|---|---|---|---|
| January .... | 422,512,494 | 488,806,638 | 496,983,717 |
| February.... | 394,440,344 | 417,196,433 | 445,495,483 |
| March ...... | 436,122,097 | 445,641,761 | 516,599,027 |
| April....... | 427,952,558 | 481,870,212 | 516,835,163 |
| May........ | 456,509,855 | 553,187,580 | 523,035,907 |
| June........ | 473,591,527 | 500,693,908 | 532,151,477 |
| July........ | 457,642,572 | 501,318,407 | 571,866,633 |
| August...... | 483,551,833 | 485,441,753 | 565,974,550 |
| September.. | 474,787,902 | 501,800,523 | 575,804,470 |
| October .... | 532,205,063 | 574,551,047 | 628,881,303 |
| November .. | 508,258,250 | 529,308,500 | 562,444,393 |
| December... | 467,092,208 | 479,312,170 | .......... |

"Only Cigar Bands are Good for Estimates. Send Nothing but Cigar Bands Under this Offer.

"In case of a tie in estimates, the amount offered will be divided equally among those entitled to it. Distribution of the awards will be made as soon after December 1st, 1903, as the figures are obtainable from the Internal Revenue Department of the United States for November, 1903.

"Write your full name and Post Office address plainly on packages containing bands. The postage or express charges on your package must be fully prepaid, in order for your estimate to participate.

"All estimates under this offer must be received on or before October 31st, 1903, by the

"Florodora Tag Company, Jersey City, N. J.

"Send each estimate on a separate piece of paper with your name and address plainly written on each.

"You do not lose the value of your bands. Receipt will be sent you for your bands, and these receipts will be just as good as the bands themselves in securing Presents illustrated in our Catalogue.

"Handsomely illustrated 80-page catalogue (page 7 in. x 10 in.) showing 11 Presents exactly as they are, and with beautiful embossed cover lithographed in 10 colors and gold, will be mailed to any address upon receipt of 10 cents, or ten tags, or 20 cigar bands."

On his arrest the relator sued out a writ of habeas corpus, and on the return thereto was discharged on the ground that the scheme advertised by him was not a lottery within the definition of the Penal Code, and that hence no crime was charged against him. The order of discharge was affirmed by the Appellate Division by a divided court, and from that order this appeal is taken.

Doubtless the purpose of the Florodora Company in establishing the system of competition for prizes detailed in the advertisement was to increase the sale of its various

brands of cigars. For that purpose it was justified in using any innocent or legal means to attract customers, and even the legislature could not, under the guise of enacting a police regulation, interfere with this liberty. (People v. Gillson, 109 N. Y. 389.) But the prohibition and regulation of gambling in all forms and lotteries of every kind are unquestionably valid exercises of legislative power, and if the scheme established by the advertiser was in effect a lottery, the fact that the dominant purpose was merely to increase the advertiser's business does not save it from condemnation. A lottery is defined by the Penal Code (sec. 323) as "a scheme for the distribution of property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether called a lottery, raffle, or gift enterprise or by some other name." By section 327 advertising a lottery is made a misdemeanor. That the scheme provides for the distribution of property is apparent on its face. That the persons among whom the distribution is to be made pay a valuable consideration for the chance when they purchase the cigars, the bands on which entitle them to compete for the prizes is settled by authority. (Hull v. Ruggles, 56 N. Y. 424.) Therefore, the only question presented by the case is whether the distribution is made by chance or not.

It is not necessary to enter into a very elaborate discussion of what constitutes chance. Nearly all people at this day believe (however inconsistent their conduct at times may be with such belief) that the laws of nature are uniform and that all phenomena or occurrences are the necessary effect of antecedent causes operating according to fixed laws. "It is strictly and philosophically true in nature and reason that there is no such thing as chance or accident; it being evident that these words do not signify anything really existing, anything that is truly an agent or cause of any event; but they signify merely men's ignorance of the real

and immediate cause." But though nothing occurs in the world as a result of chance, the occurrence may be a matter of chance to the observer from his ignorance of antecedent cause or of the laws of their operation. If one is told to draw from a box of which he is informed simply that it contains black balls and white balls, it is to him a matter of equal chance whether he draws a black one or a white one, and this though in fact the box contains ninety-nine of one kind and one of the other. Nor would the chances to him be at all changed if he were told that there were ninety-nine of one kind and one of the other unless he was told of which color the ninety-nine were. Therefore, that may be a matter of chance to one man which is not a matter of chance to another, and with different men the chances of the occurrence of any event may differ greatly. It may be said that an event presents the element of chance so far as after the exercise of research, investigation, skill and judgment we are unable to foresee its occurrence or non-occurrence or the forms and conditions of its occurrence.

The learned judge who wrote for the majority of the Appellate Division said of the contest or competition presented in this case : "It is manifestly impossible for any one to ascertain or know in advance the number of cigars in a given month upon which the Government will attach revenue stamps of the denomination of three dollars per thousand. The period for presenting estimates closed on the last day of the month preceding that for which they were to be made, and obviously there are many other elements of chance that render it difficult for any one to make any estimate that will approximate accuracy." The correctness of this statement cannot well be questioned. He thought, however, that knowledge of the condition of the tobacco trade, the importation of cigars and similar matters not stated in the advertisement would enable those possessing the information to estimate more accurately than others ignor-

ant of these conditions. From this the learned judge con-
cluded that the distribution would not ,depend exclusively on
chance, but, to some extent at least, be affected by the
exercise of judgment, and that, therefore the scheme did not
constitute a lottery.

Pure chance is defined by Black in his Law Dictionary to
be "the entire absence of all means of calculating results,"
and if to constitute a lottery it is necessary that the distri-
bution should be purely by chance without any other ele-
ment affecting the result, as has been held in a number of
jurisdictions (Caminador v. Ulton, 60 L. J. 116 [1891]; Hall
v. Cox, L. R. [1 Q. B.] 198–1899; Regina v. Dodds, 4 Ont.
Rep. 390; Regina v. Jamieson, 7 id. 149; U. S. v. Rosen-
bloom, 121 Fed. Rep. 180; People v. Elliott, 3 L. R. A.
405; Opinions of U. S. Attorneys-General, vol. 19, p. 681),
then it may be conceded that the scheme before us is not a
lottery. Our statute, however, does not provide that the
distribution must be by pure chance or by chance exclusive-
ly, but by chance. The construction of this term has been
presented in several states in which the statutes imposed
penalties for betting on games of chance not inflicted on
other modes of gaming. The earliest case on this subject is
that of State v. Gupton (8 Iredell, 271), where the distinc-
tion between games of chance and those of skill was fully
discussed. It was there said : "We believe that in the
popular mind the universal acceptation of a 'game of
chance' is such a game as is determined entirely or in part
by lot or mere luck, and in which judgment, practice, skill
or adroitness have honestly no office at all or are thwarted
by chance. As intelligible examples the games with dice
are determined by throwing only, and those in which the
throw of the dice regulates the play, or the hand at cards
depends upon a dealing with the face down, exhibit two
classes of games of chance." On the other hand, games of
chess, checkers, billiards and bowling were held to be games

of skill.   This distinction has obtained in all those jurisdictions where the definition of the term "game of chance" has been material under their statutory law.   (Voortham v. State, 59 Miss. Rep. 179; Euhancs v. State, 5 Mo. 420; Harless v. U. S., 1 Morris [Iowa], 169; Vascock v. State, 10 Mo. 505.)   Throwing dice is purely a game of chance, and chess is purely a game of skill.   But games of cards do not cease to be games of chance because they call for the exercise of skill by the players, nor do games of billiards cease to be games of skill because at times, especially in the case of tyros, their result is determined by some unforeseen accident, usually called luck.   The test of the character of the game is not whether it contains an element of chance or an element of skill, but which is the dominating element that determines the result of the game.   This is in harmony with the views expressed in our own decisions, though the exact question has not been before us.   In People ex rel. Lawrence v. Fallon (152 N. Y. 12) it was held that the award of a prize or stakes for the successful competitors in a horse race was not a lottery.   Judge Martin there said.   "There is certainly a great difference between a contest as to the speed of animals for prizes or premiums contributed by others and a mere lottery, where the controlling, and practically the only element, is that of mere chance alone   A race or other contest is by no means a lottery simply because its result is uncertain or because it may be affected by things unforeseen and accidental."   Equally we think that a lottery does not cease to be such and becomes a mere contest because its result may be affected, to some slight extent, by the exercise of judgment.

As already said, the cases cited by the learned judge at the Appellate Division support his conclusion.   In the last English case (Hall v. Cox, supra), a prize to the subscriber to a newspaper who should approximate most closely the number of deaths in London during a specified week was

held not to be a lottery. In Regina v. Dodds (supra) it was held that the award of a prize to the person who should most closely estimate the number of beans in a glass jar was dependent on the exercise of skill or judgment and not on chance. These decisions proceeded on the ground that to constitute a lottery the distribution must be exclusively by chance. On the other hand, in Huddleson v. State (94 Ind. 426) a precisely similar scheme, the award of a prize to the person who should estimate most closely the number of beans in a glass globe, was held to be lottery. The court there said : "An expert mathematician might more nearly fix the size of the globe than an entirely uneducated person. And so he, and persons of better judgment, might more nearly fix the number of beans in the globe than persons of less judgment; yet the exact number would be a mere matter of guessing. That anyone should guess the correct number would be a matter of the merest chance, because there are no means of attaining to a certainty." So far as the cases in the Federal courts are concerned it is not necessary to refer to them as they have been in effect overthrown by the recent decision of the Supreme Court of the United States in Public Clearing House v. Coyne, Postmaster (rendered May 31st, 1904). That was an action to restrain the postmaster of the city of Chicago from interfering with the plaintiff's mail. The plan for the payment of money by the subscribers and its distribution at a subsequent period among those who kept up their membership is so elaborate and complicated as not to permit the presentation of even its general outlines. For information as to its character reference must be had to the case as it appears in the reports. All that can be said of it here is that every member who continued to be such at the period of distribution was entitled to a return of his payments with certain accretions, depending upon the number of persons he had induced to join and the number who had dropped out prior to the

time of the distribution.   The postmaster-general impound-
ed  the plaintiff's mail on the theory that it was engaged in a
scheme  for  obtaining  money  under  false  pretenses.   His
action  was  upheld  by  the  Supreme  Court,  but  the  majority
placed  their  decision  on  the  ground  that the scheme was a.
lottery.   The court, through Mr. Justice Brown, said :   ''It
is true, as urged by the counsel for complainant, that in.
investing  money  in  any  enterprise  the  investor  takes  the
chance  of  small  profits,  or  even  of  failure,  as  well as the
hopes  of  large  profits; but such enterprises contemplate the
personal  exertions  of  the  investor,  or  of his partners, agents.
or  employes,  while  in  the  present  case  his  profits depend
principally  upon  the  exertions  of  others,  over  whom  he has.
no  control  and  with  whom  he has no connection.   It is in
this  sense  the  amount  realized is determinable by chance.''

If  we  examine  the  plan  of  distribution  advertised,  the
number  and  character  of  the  persons  who  were  invited to
compete  for  the  distribution  as  well  as  the  event by which
the  distribution  was  to  be  determined,  we think it perfectly
clear  that  the  dominating  and  controlling  factor  in  the
award  of  the  prizes is chance.   We well know that in many
lines  of  trade  and  business  there  are  experts who are able,.
by  the  possession  of  information  and  the  exercise  of judg-
ment,  to  forecast within limits the output of the products of
the  trade.   Success  in  business  may  depend  in  no  small
degree  on  the  accuracy  of  such  forecast.   So  also there are
expert  statisticians,  both  in  government  employ  and  in that
of  private  commercial  houses,  who  are  known  for  their abil-
ity  to  predict  the  probable  yield  of  the  crops  that  will be
harvested  during  the  current  year.   If  the  contest  for a
prize  was  to  be  had  among  experts,  the  award  of  the  prize,
despite  the  many  elements affecting the result which no one
could  foresee,  might  be  held  dependent on judgment and not
on  chance.   But  the  competition  before  us  is  not  at all of
that  character.   The  scheme  contemplates  over  thirty-five

thousand competitors. From the table given in the adver-
tisement it appears that the quantity of cigars stamped
varies from month to month in the same year as greatly as
forty millions and between a month of one year and the cor-
responding month of the next year as greatly as ninety mil-
lions; and that the number stamped in the month immedi-
ately previous to that for which an estimate is called was
five hundred and sixty-two millions. It would seem perfect-
ly clear that if several experts should agree in estimating the
output within five millions, or one per cent of the number
actually stamped, it would show a remarkable accuracy in
their methods of calculation. Yet, with thirty-five thousand
competitors the probabilities are overwhelming that the first
prize will be won by a very much closer approximation. If
the difference between the estimate which won the first prize
and that which secured the second prize should be only ten
thousand or even only a hundred thousand, would any one
deny that the result occurred through "pure chance" as
defined, and that it did not proceed from the possession of
superior information or the exercise of greater judgment or
skill? While the advertisement probably does not give
information of every factor which may influence the result
that competitors are asked to forecast, it does give the prin-
cipal data requisite for making an estimate. It was not
desired to obtain estimates from those qualified for the work
by experience and judgment and thus make it a contest of
skill or knowledge; on the contrary, it was sought to elimin-
ate as far as practicable the elements of knowledge and
judgment, and by giving the general statistics of the subject
make the contest as fair a gamble for the advertiser's cus-
tomers as possible. We think the distribution in this case is
controlled by chance within the meaning of the statute and
that, therefore, it is illegal. The scheme certainly falls far
within the requisites of a lottery as defined by the Supreme

Court of the United States in the Public Clearing House case, under a statute very similar to our own.

The orders of the Special Term and Appellate Division should be reversed and the relator remanded to custody.

PARKER, Ch. J., O'BRIEN, BARTLETT, MARTIN, VANN and WERNER, JJ., concur.

Orders reversed.